May it please the Court, Robert Schubert for Plaintiff and Appellant James Turkle Trust. I'd like to reserve three minutes for rebuttal. Your Honor, plaintiff believes that the decision of the district court below must be reversed on two independent grounds. The first ground is that the Court misinterpreted what is known as the capital treatment event clause through which Wells Fargo redeemed over $800 million worth of securities, claiming that they were no longer entitled to use them as Tier I capital. And we think the Court made two basic errors in reaching that conclusion. In interpreting the capital treatment event clause, it looked at that clause specifically in isolation from the basic contract and all the contract documents that gave rise to the issuance of securities, rather than interpreting them in the context of all the contract documents to try to determine the benefit of the bargain. And we submit that until the benefit of the bargain on both sides is known, it's impossible to look at that clause in isolation. Roberts, can I ask you first whether you received the Court's order about subject matter jurisdiction? I did. Oh, okay. I did, Your Honor. Maybe before you get to the merits. I definitely want to hear what you have to say on the merits, but I'm not going to be able to listen until I'm satisfied that we actually do have jurisdiction. Yes, Your Honor. That was going to be my second ground for reversal. We have looked and appreciate the Court's order, and we've looked carefully at section 9C of the Class Action Fairness Act, CAFA. And first, it seems to be a question of first impression in the Ninth Circuit. We couldn't find any cases from this Court directly deciding whether or not a case arising out of claims relating to securities would be excluded from CAFA's jurisdiction. But we've looked at 9C, which I think is the most relevant part. It's 28 U.S.C. Section 1332D9C, and it does read very broadly, essentially, that CAFA jurisdiction is excluded over class actions that relate to rights, duties, and obligations relating to or created by or pursuant to any security. And we have concluded that just looking at that language, it's likely that this is excluded from CAFA jurisdiction and the district court lacked subject matter jurisdiction. It isn't a conclusion I come to lightly because I like my first argument better than my second argument. We've taken a long time to get here, and we think we have a very strong case on the merits. But the language under CAFA seems clear, and to be totally to make it worse, there are two cases in the Second Circuit which are fairly close to this one. They involved pooling service agreements pursuant to which banks issued mortgage securities, and the Second Circuit on two occasions found that those PSAs, as they call them, pooling service agreements, although they weren't in the security, governed the security, and found it was exclusion from CAFA jurisdiction. Most of these cases come up in the context of remand motions, but I think the same law would apply. Robertson, You invoke CAFA as the sole basis for jurisdiction. That is correct, Your Honor, because we represent a very small shareholder who does not have $75,000 in controversy. So if he had $75,000 in controversy, we would have diversity jurisdiction directly, and we and the district court would have had supplemental jurisdiction over all the small clients. Our clients just had 100 shares for $2,500. So that's our conclusion, although there doesn't seem to be any binding law in the Ninth Circuit. I do prefer my first argument. We think we're right on the merits. What we have as a situation, Your Honors, is Wachovia Bank, a giant bank, which was subsequently taken over by Wells Fargo Bank, an even bigger bank, issued over $800 million of hybrid securities, securities that were sort of bonds and sort of debt. But the beauty of them, from Wells Fargo's position, was they could write the interest off on the debt that underlied the securities, and they could still treat those securities as tier one capital as if they were common stock. It was the best of all worlds. The basic business deal, if you will, the basic deal is these securities were issued to ordinary investors such as the Terkel Trust. They got a nice rate of interest. They got 7.85%. These securities were not hybrid. Let me throw it. These securities had credit risk because they were deeply subordinated. They're basically backed by these 40-year bonds that allowed Wells Fargo, Wachovia, and then Wells Fargo to deduct the interest. So they got this high rate of interest. And in the offering documents, it indicated that Wells Fargo, however, could call these, I'm calling it Wells Fargo, the bank, could call these within five years. So you got that interest only for five years. When the five years were up, all bets were off, and the bank could just call these. You got that. But what did Wells Fargo get? They got the ability, as I've indicated, to treat these as debt securities, write the interest off, and at the same time, treat them as Tier 1 capital for Fed purposes. Yeah, but I mean, you know, so I'm looking at the language of the capital treatment event exception or carve out, whatever you want to call it. And it seems to me it put you or your clients rather on pretty clear notice that it's not guaranteed for five years because something could, an event could intervene. And I hear your argument that, well, kind of implicit in this bargain was the notion that, you know, in terms of the timing, we should be protected from that. But that, there's no temporal limitation that's read into this, right? There isn't. But let me say first that under New York law, which governs this, a contract is interpreted in connection with the reasonable expectations of the parties. And going back to decisions we've cited in the brief from Justice Cardozo, the Court will imply terms reasonably necessary to satisfy the reasonable expectations of the parties. The key language is, will not be entitled to. What it basically says, to paraphrase, is Wells Fargo can call these securities if it makes a reasonable determination that there is not an insubstantial risk that it will not be entitled to treat these securities as Tier 1 capital. What does will not be entitled to mean? Wells Fargo is very clear. If you look at page 2 of their brief, it says, will not be entitled someday. But that's not what it says. If that's what they had put in the document, we would never have brought this lawsuit. It doesn't say we can call these securities if there's a non-unreasonable determination that Tier 1 capital will be lost someday. If you buy that explanation, Dodd-Frank, which is a triggering event claimed by Wells Fargo, if you buy that explanation, Dodd-Frank could have said, you're going to lose Tier 1 capital status in 2022, or five years down the road. That reading, and they say at any time, that reading defeats the expectations. And I think this has to be put in context. We have an individual investor, we think not unlike many, who buys 100 shares of this company, gets a good rate of interest, then we have a giant bank, a multi-billion dollar bank, drafting hundreds of pages of documents governing all this, and the language they insert in this particular clause is far from clear. Will not be entitled to, will not be entitled to when. Wells Fargo fills that blank in in its brief, but it's not there in the document. And we think the only way to read this is to go to the next page of the document. In fact, it's one of these horrible sentences that runs for, I don't know, pages. I'll have to pull it out, Your Honor. There is more than an insubstantial risk that the title of the company will not be entitled to. So as soon as the not insubstantial risk emerges, that's the trigger. Yes, and I think that's an excellent point, Your Honor. But it works against you, in my view. No, it doesn't, Your Honor, I believe. Okay. There is no risk, because when Dodd-Frank passes, when Dodd-Frank passes, it's not a question of risk anymore. We know as a certainty that these bonds will start to lose their Tier 1 capital status in January of 2013. It's not a risk. It's a certainty. But that certainty of the — I'm sorry, Your Honor, I don't mean to interrupt. But if it's even more than a risk than a certainty, then the verb will — I mean, it's not — Well, I think the verb — you have to interpret will not be entitled to. That's where you come around to. Wells Fargo says it could be 5 years, 10 years, 20 years down the road. We say when Dodd-Frank is so clear that you can have a phase-in of the end of Tier 1 status starting in January 2013, and the basic deal this individual got was 5 years interest, and what Wells Fargo got in return was an out. If we're not going to have Tier 1 capital status or there's a not insubstantial risk we're not going to have it, then we get an out. But the question is when. And I think to interpret it their way does violence to the basic bargain. There's another point — keep track of my time here — there's another point. Wells Fargo can't make any determination at once. It has to make a reasonable determination. What does that mean? We think when you defeat the reasonable expectations of the parties, it's unreasonable. I think the district court erred in a number of respects. When it looked at these documents drafted by best lawyers money can buy, we've got a big bank drafting these documents any way it wants, and the individual investor signs up to it. The district court said, well, reasonable means they don't have to be right, they could be wrong, they have to be reasonable. We think that's the wrong interpretation, and that takes at best ambiguous language in the contract and resolves it in favor of Wells Fargo. Same as the will not be entitled to. I mean, you could read it their way, will not be entitled to at any time. Yes, you could. You could read it our way. Those are two reasonable interpretations. That's ambiguous under New York law. Once the contract is ambiguous, it's read against the drafter. And this case cries out for that. This is a giant bank selling these securities to ordinary investors. It could put any language it wants in there. It picked language which is, at best, hard to figure out what it means in this context. And ambiguity relates to the context. It relates to how do these provisions apply to the facts of this case. And I think, at best, the language is ambiguous, and is ambiguous language, it needs to be read and resolved against Wells Fargo. If I interrupted, I apologize, Judge Watford. Scalia. Why don't we hear from the other side, and then you've got three and a half minutes left. Thank you. This guy. The other side. Good morning. May it please the Court. Bruce Erickson for the appellee, Wells Fargo and Company. Let me start with the subject-matter jurisdiction point. And are you sharing argument? You're doing it all yourself? I do it all myself, I believe, unless I need assistance. I just saw another person sitting over there. Yes. But I'm going to do all the talking, I believe. Two grounds for subject-matter jurisdiction here. The first, CAFA is one ground, but we don't even need to get to the Class Action Fairness Act, because there's complete diversity of citizenship here. We have a Kansas plaintiff. We have a defendant, which is a Delaware corporation, headquartered in San Francisco. Now, the question I'm sure you had raised is what about the amount of controversy? The only amount pleaded in the complaint, and I refer to page 205 of the excerpts of records, is $79.7 million, but that is, of course, for the entire class. Here, however, though, we have a situation where the class claims can all be aggregated, unlike the usual case. The reason for that is as follows, multifaceted reason. First of all, the claims of all class members arise under a single instrument. What is that instrument? It's the trust indenture. All the class members assert that they are beneficiaries of that trust. Sotomayor, wouldn't we need complete diversity across the entire class, and do we know that? No, just as to the name plaintiff. Under 1332a, just as to the name plaintiff. Okay. Yeah. So then I think there's absolutely no issue on this record as to the complete diversity, and that's the question. Just the amount of controversy? Just the amount, yes. As I was saying, all their claims arise under a single instrument, the trust indenture. All the class members assert that they are beneficiaries of that trust. They all seek to construe that indenture. They would obviously all be bound by the result. They don't seek or make a claim on particular assets, but a pro rata share of trust assets. Their claims are thus common and not several. They thus would be in the nomenclature used before the 1966 amendments to Rule 23. They thus would thus be a true class action, and it's one in which the claims can therefore be aggregated. Therefore, the relevant number is the pleaded number. Again, I refer you to page 205 of the excerpts of record, and that number is $79.7 million. That's what the class is claiming. That obviously satisfies the $75,000 test. That's a really interesting argument. Under 1332, before CAFA was added, it may still be a good argument, but query whether the enactment of CAFA is designed to supersede that case law that you've just been relying on. Because what CAFA was trying to do was to try to get a fair number of suits into Federal court subject to certain exceptions, and so it may be I'm supposed to read the new CAFA statute as implyingly, impliedly getting rid of that old law. I certainly am not aware of any cases, Judge Fletcher, that suggest such an interpretation. And I would think it an odd reading of CAFA to suggest that it narrowed 1332a when the entire thrust of CAFA was to broaden diversity jurisdiction, to bring national class actions involving more than $5 million, which clearly is, into Federal court. So I would think it — I understand what you're saying, but I don't think there's any case law that suggests that, and it seems to me contrary to the entire thrust of CAFA. So as I say, I believe, first of all, there's jurisdiction under 1332a, and if there is, problem over, as is the subject matter jurisdiction. But I also think there's jurisdiction under CAFA. I agree with some things my opponent said, that there's no opinion of this Court that deals with the — with the 1332d-9c exception. So let's talk a little about that. To start with, no question, but this is a case that satisfies 1332d-2. It is, as I said a moment ago, clearly a national class action. Clearly, the amount in controversy is over $5 million on an aggregate basis. So we satisfy the basic jurisdictional requirements of CAFA, which leaves the only question being, does the exception apply? And my opponent doesn't argue that subparts a or b apply, and he's clearly right in that. But why doesn't a apply? a, because the point of a, and again, there's no opinion in this circuit on point, although there are district court opinions and opinions from other circuits, a is to harmonize CAFA with SLUSA, the Securities Litigation Uniform Standards Act of 2008. And what a basically says, perhaps not totally artfully, is that if the case is under SLUSA, go to SLUSA and get your answer there. This is not a case under SLUSA where representations or fraud or that or State law security fraud claims have been alleged. So we don't need to worry about SLUSA. a doesn't apply. b is the essentially the Delaware ---- Robertson, I know, and b doesn't apply, but a, that is definitely not what a says. And so do other circuit court precedents that interpret a in the way you just articulated? SmithYes. A Second Circuit case, there are, Your Honor, a Second Circuit case called the State of Pew v. Cardarelli. I don't have the submission here, but it says exactly what I just said about a, as does the district court opinion from Judge Alsop in the Northern District here called Tuttle v. Skybell Asset Management, 2010 West Law, 4807093 at star 6.   RobertsonOkay. But you were going to explain why c doesn't apply. SmithYes. So let's turn to c, which is the only one that my opponent claims to apply. Let's look at what c says. It says any class action that solely concerns a claim that relates to the rights, duties, including fiduciary duties, and obligations relating to or created by or pursuant to any security, it would exclude those claims. We break this down so it's solely. Now, we look at the complaint here. What does it allege? It alleges two claims. The second claim is a claim for a breach of the implied covenant of good faith and fair dealing. That implied covenant is said to be implied in the indenture. That's what the complaint says at paragraph 56, page 206 of the excerpts of records. So this, that claim is not a claim created by or pursuant to the security, because the indenture is not the security. The security is a certificate that is Exhibit C to the amended trust agreement. You may see it in the supplemental excerpt of record at pages 84 through 87. That's the security. The indenture is a different document. Now, the question you may want to ask me is, what about the other words, Mr. Erickson, what about relating to? How should we read that? I would submit, Your Honors, that relating to requires a direct relationship between the duty, here the implied covenant, and the security. Relating to here should be construed narrowly for several reasons, the first of which is that, look at the company it keeps. It's part of the phrase relating to or created by or pursuant to. That calls upon us to look at the associated words canon. Now, that's a canon that has a Latin name, but I'm not going to try to say it. Huston Generous. No, that's not the one. Nocitor. You're going to make me say it. Reason Philophober. I think I'm being goaded into mispronouncing Latin. Nocitorat, so she, is something like that. The associated words bear on one another's meeting. Here, relating to should be similar to created to or pursuant to, meaning, you know, arising from the security, which, as I said, is not the indenture. Now, if you were not to follow that canon of construction, if you were to give relating to a very broad reading, several, I think, wrong things would happen. First of all, C, subpart C of D9 would swallow the other two utterly, because if anything that relates in any very broad sense to a security is encompassed in C, then the limitations and A and B are just out the window, and I submit that you shouldn't read a statute so that whole subparts would simply fall away. The other reason is that to read C that broadly really makes no sense. And the reason for that is this. The point of C, insofar as one can determine it from the less-than-pellucid language, was to leave to State courts issues about securities that typically arise under State law. For instance, I mean, most securities are creatures of State law created by documents that are filed with the State Secretary of State, so on. If you're looking at common stock, you look at the Articles of Incorporation. If you're looking at most kinds of preferred stock, not trust-preferred, but most kinds of preferred stock, you're looking at a Certificate of Designations. These are documents that are filed with the Secretary of State of the State, and they're make, therefore, sense for State courts to take a look at those. A trust indenture is the document we're talking about here. A trust indenture is a creature of Federal law. It's very heavily regulated by the Federal Trust Indenture Act of 1939, which is a Federal statute. So to say when we're looking at a trust indenture and construing it, the creature of Federal law, that we ought to send that to State court really makes no sense, and for that reason, as well as the associated words, canon, I think it would make no sense to read C very broadly, as my friends on the other side would. Now, my friends referred to obliquely a couple of Second Circuit cases that do take a somewhat broader reading of Subpart C. I would urge you not to adopt that reading here for two reasons. First of all, those cases involve a different sort of piece of paper. A different sort of instrument than we're talking about here. My friends referred to that as a pooling and servicing agreement, which it was in those cases, which are cases that involved RMBS. A pooling and servicing agreement is like articles of incorporation or like a certificate of designation, an agreement governed by State law. It's simply a State law contract. It is not, therefore, like the trust indenture that's at issue here, which is a creature of Federal law. So that's a real distinction between those cases and the case you have at bar here. Okay. I think I've said all I need to say unless you have further questions on subject matter jurisdiction, and, therefore, I'd like to turn to the merits and the construction of the Capital Treatment Event Clause. I think it's clear. I think the district court got it right, and it means what it says. What my friends on the other side are urging this Court to do, and this is not merely my characterization of what they're urging, their own words, they say in the reply brief, they say the Court can and should narrow the scope of words and expressions in order to align the contract language with the purpose of the agreement. That seems to me to be an invitation to rewrite the contract to align it with their own version of what the agreement means or what the intent of the banks was. But how do we determine that intent under New York law, which is the law applicable here for interpretive purposes? We interpret the contract by reading the words of the contract, not by going elsewhere. And when we read the words of the contract, I think it's quite clear that it doesn't say what my friends would urge upon you. To start with, it doesn't guarantee investors five years of interest at a high rate. What it says in a series of separate independent clauses in the indenture is that you will get the high rate of interest, the security will not be redeemed unless and until one of any of the following events occurs. There is what they call the optional redemption date, to be sure, December 15th, 2012, at which point the security can be redeemed for any reason or no reason. But before that, there are a series of other reasons that if those things, those events, as they're called, occur, the contract can be redeemed. And there's the capital treatment event clause that's relevant here. There's also the investment company event. There's the tax event as well. And as the district court I guess their reading seems so reasonable to me. I mean, I look at the language and I grant you there's no, there isn't the temporal limitation they're talking about. But on the other hand, if we accepted your reading of this, it would mean that if the day after, you know, these securities issued, Sarbanes-Oxley had been passed and the phase-in date had been 10, 20, 30 years down the road, you would still say, oh, well, that's okay. We're in business. We're able to redeem these even though we've only paid you the interest for one day or one week. And it just doesn't seem like that could possibly have been the bargain that the parties had in mind when they put in this capital treatment event clause. I think you mean Dodd-Frank and not Sarbanes-Oxley. Sorry. But I take your point, Judge Fletcher. Judge Wofford, so good. We're even. Yes. Yes. More than even. I'm sorry. Judge Wofford, of course. It is what the capital treatment event clause says. It's, you know, if it were to say what my opponents say it should say, it would be something very simple along the lines of we may redeem the security if it starts to lose Tier 1 treatment. It would be something that short and simple. It's, as Judge Fletcher pointed out, it's not that short and simple. It's worthy. It's long. But it is clear. It focuses. I agree with you on the long part. What does it say? It says the reasonable determination by the company, it focuses on announced prospective change and not insubstantial risk, and then uses the word will. So it is forward-looking in that way, and there are good practical reasons, which we outline in our brief. I realize I'm running out of time here. But there are good practical reasons, good business reasons why a bank wants the future not be considered core capital, will not be considered Tier 1 capital. There are good practical reasons to draft it that way. Therefore, the bank drafted it that way. And it's clear. And I think the district court was right. And its decision should be affirmed. Thank you. Let me briefly speak to the jurisdictional issue. The two Second Circuit cases which seem rather close to this one on the issue of jurisdiction are Greenwich Financial versus Countrywide Financial at 603 Fed 3rd 23, decided in 2010, and BlackRock Financial versus Segregated Account, 673 Fed 3rd 169, Second Circuit 2012. And those cases, although they don't involve indentures, in those cases the court analogizes, both those cases the court analogizes the PSAs, the pooling and service agreements, to indentures and hold that although the rights or obligations are not in the security, security is just a very simple piece of paper, the security is governed by these pooling and service agreements, which are like indentures. So if we were in the Second Circuit, I think it would be clear that the court would lack jurisdiction under that provision of CAFA. My colleague also on the jurisdictional issue indicates that C doesn't apply because the trust indenture is a creature of federal law. The basic problem with that is the trust indenture states it's governed by New York law, and if you look in the briefs, I don't think the trust indenture act comes up in our briefs or Wells Fargo's briefs, and there really isn't a question of federal law. This is straight New York contract interpretation. So I think that's a bit of a stretch. I think it's quite a stretch to say that that distinguishes this from the clear language of 9C. With respect to the issue of normal, I'll call it ordinary jurisdiction, and the $75,000 being satisfied through the entire claim, we have not spoken to that because that wasn't in the notice from the court. It's a creative argument, and if the court is interested in it, we'd be happy to respond to it in a brief. We haven't researched that issue. Let me speak briefly to the merits. I think it's obvious what happened here. What happened here is that these securities were issued with 7.85 percent, a high rate because they were risky, but a very high rate, a nice rate, in 2007, and they were going to remain outstanding for five years unless one of the events that my colleague referred to. Each of those events would have caused Wells Fargo to lose the benefit of its bargain, but the event which did occur, Dodd-Frank, did not cause Wells Fargo to lose any benefit of its bargain because Dodd-Frank didn't spring into effect on this issue until after the five years was up. What really happened here is obvious. Interest rates with the grand recession dropped near zero. You could borrow at the Fed window at three-quarters of 1 percent. You could refinance these securities at extremely low rates of interest. So Wells Fargo took advantage of the language, very confusing language, unclear language in its own documents among hundreds of pages, and took advantage of ordinary investors like the Terkel Trust. And that's what really happened here. They wouldn't have done it if interest rates hadn't dropped to near zero due to the recession. Thank you very much. Thank you. Thank both sides for their argument. It's obvious that the jurisdictional question is important and somewhat difficult. It may be that we'll ask for additional briefing from the parties. And if so, we'll send an order out. If the court finds lack of jurisdiction, we suggest the proper result is a reversal and a remand to the district court with instructions that the case be dismissed for lack of subject matter jurisdiction. That is what would happen if we find there's no jurisdiction. Because the jurisdiction of the appellate court is still the same as the district court. No, no. I'm sorry for running over my time. No, it would be a dismissal. But we may. If we want additional briefing, we'll send an order out. Thank you.
judges: Duffy, Fletcher, Watford